## THE RICHMOND.

### RUSSELL-CRONIN CO., Inc., v. DIRECTOR GENERAL OF RAILROADS.

(District Court, S. D. New York. August 20, 1920.)

Shipping ⟶86(2)—Evidence held to show lighter capsized from unseaworthiness, and not from swells from passing tug.

On trial of libel by owner of lighter, which capsized after libelee's tug had passed, the libel charging that the tug passed too close and at a rate

of speed so great that her displacement waves and swells caused the lighter to capsize and sink, evidence *held* to show that the capsizing was caused by unseaworthiness of the lighter, due to inherent weakness or overloading, and not from fault of the tug.

In Admiralty. Libel by the Russell-Cronin Company, Inc., as owner of the steam lighter Richmond, etc., against the Director General of Railroads. Libel dismissed.

Foley & Martin, of New York City (James A. Martin, of New York City, of counsel), for libelant.

Park & Mattison, of New York City (Samuel Park, of New York City, of counsel), for insurers.

Harrington, Bigham & Englar, of New York City (T. Catesby Jones and Leonard J. Matteson, both of New York City, of counsel), for Director General of Railroads.

KNOX, District Judge. On the morning of September 20, 1918, the steam lighter Richmond went to the Port Reading coal docks and took on board about 135 tons of coal. With this cargo she proceeded to the dredge McMartin, which was then anchored in the East River about 800 feet off Pier 11 on the Brooklyn shore, and about 1,200 to 1,300 feet off Pier 8 on the Manhattan shore. It was here that the Richmond was to deliver part of her cargo. The lighter had hardly been made fast on her starboard side to the port quarter of the dredge when the steam tug Auburn passed by, en route from Pier 8, Manhattan, to Pier 46 in South Brooklyn. Almost as soon as the Auburn had cleared the McMartin and the Richmond, the latter turned on her port beam ends and sank.

Thereafter a libel, on behalf of the owners, insurers, officers, and crew of the Richmond, was filed against the Director General of Railroads, by whom the Auburn was then being operated. The libel charged the tug with having passed too close to the Richmond and at a rate of speed so great that her displacement waves and swells swept over the Richmond and caused her to capsize and sink. The Director General denies that the tug was at fault, and in support thereof alleges that the Auburn had just landed a barge at the end of Pier 8 with her port side at the pier end; that she departed therefrom under a hard aport helm, and, coming around, did not gather full headway until she was about abreast the Richmond and McMartin, that the tug passed the lighter with a good clearance, and that it was impossible for the tug's wash to have brought about the Richmond's disaster.

As is usual, there is a sharp conflict of testimony between the witnesses of the respective parties, and the result to be reached depends largely upon my conclusions of fact as to the speed of the Auburn, the distance at which she passed the Richmond, and the height of her swells. I have but little doubt that the swells of the Auburn somewhat precipitated the sinking of the Richmond, but, if the swells were not unduly large, and the disaster of the Richmond was primarily due to her own infirmities, the libel must be dismissed.

According to libelant's witnesses, the Richmond was properly trimmed, she was seaworthy, and, generally speaking, without all fault. It is said that the Auburn passed by her at a distance of not over 75

feet, and that immediately thereafter three or four swells, reaching a height, I should say, from libelant's testimony, of at least 6 feet, swept in upon her and brought about the catastrophe. It appears that the deck of the Richmond was above the water about 4 feet forward and about 1 foot amidships. The lighter was boarded up along her rails, so as to contain the coal, which, piled on deck, reached a height of 7½ feet above the surface thereof. When the swells of the Auburn struck the Richmond, the latter was lifted up and slammed against the side of the dredge, and from the impact and the tendency to follow along the sweep of the swell the cargo of the Richmond shifted to port, occasioning a list, which with the succeeding swells, caused the Richmond to turn over.

It is unnecessary, I think, to detail the testimony of the various witnesses for the libelant, save to say that I am not convinced that the Auburn was as near to the Richmond as 75 feet, even though there is for libelant a surprising unanimity of testimony to that effect. The Auburn is 108 feet over all, and I am unable to see why, as a matter of navigation, and being bound for Pier 46, Brooklyn, she should, in the natural course of events, pass so close the Richmond; in other words, to get within 75 feet of the lighter, the Auburn was going out of her way. I should assume that, when the tug came around from the end of Pier 8, Manhattan, she would turn within a distance of not over 500 feet, and, if she did so, her natural course would appear to be straight down towards her destination. The tide was slack, there was little or no wind, and consequently, no occasion for an unusual maneuver. A direct course from such position would, when the tug was straightened out, take her something near to 450 feet away from the Richmond. It also seems not unreasonable to suppose that in passing the dredge, which had been anchored in the river for a considerable period, the Auburn would have had some regard for the possibility of becoming entangled in its anchorage cables; and, even though the danger of such entanglement was so slight as to be all but negligible, the master knew of the regulations of the War Department requiring vessels not to exceed 6 miles per hour in passing such plants, and would not deliberately invite liability for accident.

But, aside from this latter, I am unable to see any reason or necessity whatever for the Auburn to come into such proximity to the Richmond, and I seem forced to the conclusion that the witnesses for the libelant are in error in their estimates of the distance of the tug from the lighter. This conclusion would be much more satisfactory than it is, were it not for the fact that the engineer of the dredge testified that the Auburn was within 50 to 75 feet of the Richmond. This witness made a good impression upon me, and he had, so far as could be seen, no interest in the outcome of the case. He also said on cross-examination that the Auburn made no greater swells than are ordinarily made by boats of her class. He further testified, however, that the boat was making a speed of from 10 to 12 miles per hour and that she threw a big swell.

In contradiction to this there is the testimony of all of the tug's crew, one of the government inspectors on the dredge, and the master of the Pennsylvania Railroad tug that the swell of the Auburn was

nothing unusual, and all of said witnesses, save the Pennsylvania cap-tain, who did not testify on the subject, deposed that the speed of the tug was much less than 10 to 12 miles per hour. Of the witnesses so testifying the inspector and captain have no discernible interest in the outcome of the trial, whilst, of course, the Auburn's crew have the in-centive to stand by their ship.

Notwithstanding, however, the evidence of the crew is more or less corroborated by the physical facts. I refer to the width of the river between Pier 8 and the lighter, the probabilities as to what was done in coming away therefrom and the location of Pier 46, Brooklyn. Ac-cording to the time-card of the tug, it took at least 15 minutes for the vessel to go from Pier 8 to Pier 46. The chart in evidence does not show the exact location of the latter, but I think it safe to say that the distance to be traversed between the two locations is not much in ex-cess of a mile and a half. If this be true, and if the time card cor-rectly records the time elements involved, the Auburn probably did not travel at any stage of her trip upwards of 8 miles an hour. Such speed would allow for her slower progress upon turning out from Pier 8 and in going alongside the barges at her point of destination.

As to the height of the displacement waves and swells of the Auburn, the best testimony is that of Mr. Robert S. Haight, who made a trip upon the tug for the sole purpose of observing the same. I think there is no doubt that the tug upon such occasion made quite as much, if not more, speed than she did upon the day she is charged with sinking the Richmond. This witness said that the height of the Auburn's swell was not over 3 feet from valley to crest in the immediate vicinity of the boat, and gradually diminished in height as the distance of the swell from the boat was increased. He gave certain specific examples as to the effect of the swells upon craft passing the tug at a distance of 200 feet, and from that testimony one is called upon to admit that the height of the swell at a distance of say 350 to 450 feet would be con-siderably less.

From such testimony, it would seem that, by the time the Auburn's waves reached the Richmond, and if the boats were as much as 200 feet apart, and they were not more than 2½ feet in height; indeed, if the distance between the boats was lessened to 75 feet, the waves could not have been over 3 feet in height. Were such the fact, the in-undation of the Richmond in the manner described by her witnesses would be impossible. Waves of 3 feet in height would not break over her bow, nor would they have topped the closed half-doors of the engine and fire rooms. True enough, some water would in all likeli-hood have splashed on her deck amidships; but I do not think there would have been a sufficient amount of this to have seriously disturbed the Richmond's equilibrium, if she were in all respects seaworthy.

I thus come to the testimony which most definitely tends to support the proposition that the Richmond was in trouble before she reached the dredge. On the morning in question a man named Sexton, the dredge's leadsman, and Maurer, an inspector of the United States En-gineers' Department, and employed upon the dredge, were at work in the top cabin of the government craft. From this position they had a clear view of that portion of the river across which the Richmond ap-

proached their vessel. Sexton, according to his testimony, saw the lighter, and he says she had a list to port of from 5 to 15 degrees. When he first saw her, her port rail was out of the water, but by the time the lighter reached the dredge her rail was flush with the water. He was so impressed with her condition that he called the attention of Maurer to the lighter's approach. Sexton continued to watch the boat until she was made fast, when he says:

"As she got her third line fast she seemed to take a list to port all the time, and the captain passed the remark to start to trim the coal. He said to get the coal over to the other side."

The testimony continued:

"Q. Did you see anything of the tug Auburn? A. I did, after they made the remark that she threw the swell, when she was about 250 feet astern of the dredge.

"Q. What was said? A. She was 250 feet astern of the dredge, 400 feet off abreast, heading for Governor's Island. I could see the full view of her stern."

He describes the wave as "only the ordinary swell that was there on any calm day. There is always a little ripple." This testimony is in part corroborated by Maurer, who says that, when Sexton spoke to him, he watched the Richmond and "noticed that she was listing as if she was topheavy; in bad trim." When attention was called to her, he watched her until she sank, and from the moment he saw her apprehended that which came to pass. From the way in which she was loaded, he would think that the outer deck must have been under water on her port side. He did not see it under water, but she was listed to such an extent that he would expect to see the water on that side. The witness did not see the Auburn. Maurer went off duty at noon, and subsequent to the sinking and prior to the time he was relieved he made a special report of the occurrence to his superior in the government service. His testimony was given after refreshing his memory from a copy of that report, and it is entitled to whatever additional weight it thus receives.

If, as a matter of fact, the Richmond's rail was flush with the water, and in that condition she took on swells which were such as only arise from the proper navigation of tugs ordinarily and in common use in this harbor, she has none but herself to blame, if misfortune overtook her. It makes no difference whether the unseaworthiness is brought about from inherent weakness or overloading. A boat so circumstanced as was the Richmond was bound to anticipate the ordinary incidents of harbor traffic, and the degree of her seaworthiness must be measured by the necessities of such traffic, when properly conducted. After a careful review of all the testimony in this case, I have reached the conclusion not, however, wholly free from doubt, that the libelants have not sustained the burden of proof to the extent which justifies me in entering a decree in their behalf.

The libel will consequently be dismissed, with costs.